Scott, J.
The defence made in this case to the action of the plaintiffs is, that the commissioners of Knox county had not legal power to make the contract upon which suit is brought. Defendants claim that the plaintiffs were prohibited, by the fifth section of the act of February 26, 1846, from making any sale which was not a sale at par, and which did not result in an actual extinguishment or cancellation of an equivalent amount of the bonds of the county. And they allege that the sale and transfer of stock set out in the plaintiffs’ petition, did not produce its full par value, nor extinguish or cancel an equivalent, or any amount of the obligations of said county, created under said act. On the other hand, it is claimed for the plaintiffs that the conditions and limitations upon the power of sale, imposed by the 5th section of the local act of February, 1846, were.repealed by the 25th section of the general act to regulate incorporated companies, passed May 1,1852, which conferred on the plaintiffs a power of sale limited, as to terms, only by their own discretion; and secondly, that however this may be, the terms of sale, as stated in the pleadings, were not inconsistent with the limitations of the act of 1846. The 1st, 2d, 4th, and 5th sections of that act (44 O. L. L. 192) read as follows:
“ Seo. 1. That whenever a majority of the qualified electors of the counties of Delaware, Marion, Holmes, Medina, Crawford, and Knox, respectively, shall consent thereto, as provided in the sixth and seventh sections of this act, it is hereby made the duty of the commissioners of said counties, respectively, for and in behalf of their respective county, to become subscribers to 'an amount not exceeding one hundred thousand dollars to the capital stock of any qompapy heretofore or which may hereafter be incorporated to construct any railroad which of itself, or in conjunction with other com *342 pañíes, may open a direct communication through their respective county, and to or near its county seat.
“ Seo. 2. That the commissioners of each of the said counties, in payment of any amount of stock subscribed under this act, shall issue, or cause to be issued, bonds or obligations of the county, of equal amount, payable to said company and made negotiable, bearing interest, to be paid annually at the treasury of said county, at the rate of six per cent, and redeemable at such time as may be deemed expedient by the commissioners, not over twenty years from date.
“ Seo. 4. That the faith of the county so subscribing stock under the provisions of this act, and the net profits or dividends upon the stock subscribed by the county to such company, shall .stand pledged for the payment of the indebtedness and interest which may become demandable from the county under this act; and it is, moreover, hereby made the duty of such commissioners and the auditor of the county, from and after any indebtedness of the county arising, under this act, against the county, to add such per centum upon the tax duplicate of the county annually, over and above the ordinary State and county taxes, as shall be sufficient, including the dividends aforesaid, to pay the accruing interest arising under this act, and also to produce a sinking fund of such amount as they may deem expedient; and the money so levied shall, when collected, be applied to the purpose aforesaid, and to none other.
“ Seo. 5. That the commissioners of such county shall, by themselves or such agents as they may appoint, have full power to vote at all meetings of stockholders of said railroad company, in proportion to the stock owned by the county, and in all other respects to act in behalf of the county in ’the business of said company, as may be in accordance with law and best calculated to promote the true interests of the company without injustice to the county; and, moreover, the sand commissioners a/re hereby authorized, whenever they may deem the same expedient, to sell and tramsfer a/ny and all stoclc of the company subscribed or owned by the county, m order to pay off the i/ndebtedmess which may a/rise under *343 this act: Provided, however, that no sale or transfer of the stock thus owned by the county shall be of any force, except upon condition of its producing its full par valme, and the actual extinguishment or cancellaUon of an egui/oalent amount of obligations of the county created under this act.”
By the general “ act to provide for the creation and regulation of incorporated companies in the State of Ohio,” passed May 1,1852 (1 S. & C. Stat. 282), it was provided in the twenty-fifth section as follows:
“ The commissioners of any county, the city or town council of any city or town, and the trustees of any township, which county, city, town or township, has heretofore subscribed to the capital stock of any railroad company, or turnpike or plank-road company, and has issued, or shall hereafter issue, any bonds for the payment of such subscription, are hereby authorized to sell the said stock, or any part thereof, and on such terms as they shall deem to be for the interest of said county, city, town or township, respectively, and may apply the proceeds of such sale to the payment of the bonds of such county, city, town or township, respectively subscribed.”
The question arises whether the general power here given to sell stock previously subscribed operates a repeal, by implication, of the conditions and limitations of the power of salé given to the plaintiffs by the local and special act of 1846.
Prior to 1852, many local and special acts had been passed by the legislature, authorizing cities, counties, and townships to subscribe to the capital stock of railroad, turnpike, and other companies, but no general law had ever conferred such powers.
In some of these special enactments, a general power was given to sell the stock which might be subscribed, without any restriction or limitation thereon. In many cases no power of sale was expressly granted, the act being silent on the subject; and in other cases a sale was allowed only for the purpose of paying off the bonds or indebtedness arising *344 from the subscription, of stock, or was coupled with other limitations and restrictions, as in the act of 1846, now under consideration. By the research of counsel we have been referred to numerous instances of these various classes of special acts, which it would be tedious and unnecessary to cite in detail. Under these special grants of authority many of the cities, counties, and townships of the State subscribed largely in aid of railroad and other enterprises. These subscriptions frequently proved to be unwise and unprofitable as investments, and imposed heavy liabilities on the communities upon whose behalf the subscriptions were made.
The experience of the people of the State in this behalf was such, that in framing the constitution of 1851 it was specially provided, that no authority to make such subscriptions should ever be conferred by the general assembly on any county, city, town or township of the State. In the following year, the general act of May 1, 1852, was passed, which purports in the most general terms to authorize “ the commissioners of any county, the city or town council of any city- or town, and the trustees of any township, which county, city, town or township has heretofore subscribed to the capital stock of any railroad company, . . . and has is sued, or shall hereafter issue, any bonds for the payment of such subscription, ... to sell the said stock, or any part thereof, and on such terms as they shall deem to be for the interest of said county, city,” etc.
It cannot be denied that the broad terms of this enactment clearly comprehend the case of Knox county, as it stood at the date of the act. The commissioners of that county had previously subscribed $100,000 to the capital stock of the Columbus and Lake Erie Eailroad Company, and in payment therefor had issued its bonds. This is the case contemplated and provided for by the statute. And whether we look to the terms of the act, or the circumstances which may be supposed to have led to its passage, we see no reason to doubt that it falls within the very purpose and intention of the legislature. The cases intended to be provided for could not have been such as had arisen under a general law, for no *345 general law had ever authorized subscriptions by counties to the stock of railroad companies. The prior statutes to be affected by the new law could, therefore, be none other than the special acts to which we have referred, or some of them. None of them is expressly repealed or referred to in the new law — to which, however, we can give, effect only by allowing it to modify prior legislation on the same subject.
If it was not intended to apply to all cases in which a conditional or qualified power of sale had been previously granted as well as to cases in which no power of sale had been expressly conferred, then to what class or classes of cases is its application to be limited ? To cases, say counsel, arising under the special acts which contained no grant of power to sell the stock. But what conceivable policy could have induced the legislature to confer an unlimited and discretionary power of sale in every case in which a power of sale liad been previously wholly withheld, and to refuse a like extensive discretion in all cases where the power had been previously granted with limitations ? If a continual and progressive depreciation in the market values of railroad stocks had made it expedient to give full and unlimited powers of sale, where no discretion had been previously conferred, would not the same circumstance have dictated the removal of the limitations on discretion with which previous grants of a power of sale had been accompanied? The circumstances which evidently induced this general grant of unqualified powers in 1852, justify the belief that the intention of the legislature was no less general than the terms employed would seem clearly to indicate.
It is true, that repeals by implication are not favored, and are only allowed where the repugnancy is clear; but in this case there is a plain repugnancy, and the two enactments can only be reconciled by assuming, without reason, that the legislature in the latter act did not mean what they have clearly and plainly said. It has been well said, that “ every act is made either for the purpose of making a change in the law or for the purpose of better declaring the law; and its operation is not to be impeded by the mere fact that it is incon *346 sistent with some previous enactment.” Dean of Ely v. Bliss, 5 Beav. 582.
The present is not, then, the case of two affirmative statutes which are so far consistent with each other that full effect may be given to both. And in this respect we think the case of Wardell v. Arell, 2 Wash. Va. R. 282, and other cases cited by counsel for defendants, are not analogous to the case ■ before us. Nor is it a case for the application of the rule that “ a later statute, general and affirmative, does not abrogate a former, which is particular; ” for, here, no effect whatever can be given to the later general statute, unless it be allowed to modify prior special statutes by conferring powers which they withheld. And in giving this operation to it, as we have already said, no good reason is perceived for discriminating between the act of February, 1846, and other special acts which had either conferred a limited power of sale, or had failed to confer any such power. We see no reason to doubt that the legislature intended to confer a discretionary power of sale, as unlimited in respect to terms as the rights of individuals vested under prior laws would in each case permit.
It is claimed, however, that the legislature could not, constitutionally, confer on the county commissioners of Knox county the discretionary power of sale which the act of 1852 purports to confer. The argument is, that by the fourth section of the act of 1846, the net profits or dividends upon the stock subscribed by the county were pledged for the payment of the principal and interest of the bonds to be issued under that act; that this statutory pledge was a part of the contract under which the bonds previously issued by the county were at the time held by the bondholders; that the contract of sale on which suit is brought ■ is inconsistent with this pledge, and cannot therefore be held valid without impairing the obligations of a contract, which under our constitutions, both State and Federal, cannot be done.
To this claim, we think, several answers may be made. 1. We do not see that the terms of the contract sued upon were in derogation of the rights of the bondholders under *347 this statutory pledge; for the pledge was as a security for the payment of the annual interest accruing upon the bonds, and of the principal sum at maturity. By the contract of sale, the purchaser of the stock was bound to pay a corresponding amount of interest annually, and of principal at maturity. If defendants’ testator, therefore, complied with his contract, the bondholders’claims would be fully satisfied, and no occasion could arise for the assertion of his statutory lien. And we think it no valid objection that the purchaser might have involved himself in trouble by a failure to perform his contract. Besides, the hypothecation of the stock, made concurrently with the sale, left it in the power of the commissioners to secure the application of profits or dividends to the discharge of interest in arrear, or of principal at maturity. But if we are mistaken in this, still, this statutory pledge was for the security of the bondholders only, and can therefore be asserted only by them. If they are content with the sole responsiblity of the county of Knox (the obligor in their bonds), surely the defendants have no right to complain on their behalf. The act of 1852 does not become void, though it cannot, constitutionally, operate to the prejudice of rights previously vested. It does not appear that the bondholders have ever asserted or threatened to assert the right which is here set up for them; nor but that they have at all times acquiesced fully in the purchase made by defendants’ testator; nor that defendants have lost or are likely to lose any of the benefits of their testator’s contract.
Under these circumstances, we think the defendants cannot avoid the obligations of the contract in question; and that the court of common pleas therefore erred in overruling the demurrer of the plaintiffs to the answer of 'the defendants. The judgment of the court of common pleas is therefore reversed, and the demurrer to defendants’ answer sustained.
Bbinkebhoff, C.J., and Welch, White, and Day, JJ., con« curred.